*Staunton.*

## BONSACK & KISER v. ROANOKE COUNTY.

### Absent, *Moncure*, P.

1. Under an act of the legislature passed October 31, 1863, it was the duty of the county and corporation courts to make an allowance in money or supplies to soldiers and sailors and their families, of such liberal amount and in such proportions, as should be deemed just and sufficient; and it was declared that the allowance should be charged on the county, city or town, and that "provision should be made for its payment in the manner prescribed by law for sums legally chargeable on counties, cities and towns." The manner prescribed by existing laws was by county levy. The county court of R county, in December, 1863, appointed R G H county agent and treasurer of a fund to be created by loans obtained on county bonds, for the purpose of furnishing supplies as contemplated by the said act. The agent borrowed $10,000 from B & K, and executed to them five bonds of $2,000 each, sealed with the seal of the county, and dated February 21, 1865. HELD:

   1. That the act neither in express terms, nor by necessary implication, empowered the county to borrow money and issue bonds for its payment, and consequently the bonds are void.

   2. While such a power might perhaps be conferred by implication, yet in view of its dangerous nature, its great liability to abuse and the constant habit of the legislature to grant it in terms when intended, the implication, to be justified, should be very clear, if not irresistible.

   3. The supplies were to be procured by purchase, and, if need be, by impressment, through agents appointed for the purpose, and the debts thus contracted were to be paid in the manner and by the means indicated. The express designation of a particular mode of raising the means, excludes every other, though the borrowing of money might be deemed by some a more appropriate mode than a levy in the ordinary way.

4. The authorized allowance of " money " within the discretion of the
courts, instead of " supplies," must be understood as limited to
money on hand at the passage of the act, and such as might be
raised by subsequent levies.

2. The plaintiff joined issue on a plea of *non est factum*, " in this, that a
majority of the acting justices of the county were not present and had
not been summoned, etc.," but the act did not render it necessary that
a majority should be present.  HELD :

1. If the issue were immaterial and not cured by the statute of jeofails,
the usual course would be to award a repleader—that is, to reverse
the judgment, set aside the pleadings, and remand the cause with
directions that the parties plead *de novo*, for the purpose of obtain-
ing a better issue.

2. But the court will never grant a repleader, except where complete
justice cannot otherwise be obtained ; and although the issue may
be immaterial, a repleader will not be awarded, if it appear from
the record that if the plea had been properly pleaded, the decision
of the issue must have been the same.

This case was argued at Wytheville, but decided at
Staunton.

At March rules, 1879, Bonsack & Kiser filed their decla-
ration in the clerk's office of the circuit court of Roanoke
county, against the board of supervisors, in an action of
covenant broken.   The declaration alleged that on Decem-
ber 21, 1863, May 16, 1864, July 18, 1864, November 21,
1864, and on divers other days, the county court of said
county, by virtue of its general jurisdiction and of a certain
act of the legislature of Virginia passed May 9, 1862, enti-
tled "An act to authorize the county courts to purchase and
distribute salt," etc., and of divers other acts of the legis-
lature passed before the day and year first aforesaid (a
majority of the justices of the county being present),
entered several orders appointing R. G. Holland agent of
said county for certain specified purposes, and authorizing
him to borrow money for the use of the county for the
purposes aforesaid, on the faith and credit of the county,

to the amount of $80,000, and empowering him to execute for the money so borrowed from individuals the bonds and notes of the county payable in currency. That afterwards— to-wit: on the 21st of February, 1865—the said agent, acting under the authority aforesaid, borrowed from the plaintiffs $10,000, and thereupon executed and delivered to them five bonds of said county, dated the day and year last afore- said, signed by said Holland as county agent, and sealed with the county seal, by each of which bonds the said county covenanted to pay to the plaintiffs $2,000, with four per cent. interest, twelve months after date, in current money; that the county had not kept its covenants, but had broken the same, and had not paid the said several sums of money or any part thereof, to the plaintiffs' damage $10,000, etc.

The defendant demurred generally to the declaration, and also filed five pleas—viz: first, a plea of covenants not broken; second, a plea that the supposed bonds were exe- cuted for the purpose of aiding rebellion against the State of Virginia; third, a plea that they were executed for the purpose of aiding rebellion against the United States; fourth, a plea they were not the bonds of the county—"in this, that a majority of the acting justices of the county were not present and had not been summoned to appear at court when the bonds were directed to be executed"; and, fifth, a plea similar to the last one, with the additional averment that it was necessary a majority of said justices should be present and be summoned to give legal authority for the execution of said bonds; and issue was joined on these pleas.

The cause coming on to be tried on the 10th of April, 1880, the demurrer was overruled; and the case being there- upon submitted to the court on the facts agreed, the court was of opinion that the fifth plea was sustained, and that the second and third were not sustained, and judgment

was rendered for the defendant with costs; and to this judgment a writ of error was granted by a judge of this court.

*G. W. Hansbrough,* for the appellants.

*A. H. Phlegar* and *R. E. Logan,* for the appellees.

BURKS, J.   The judgment of the circuit court is based on the ground that the bonds on which the action was brought are void because not authorized by law. It was very properly conceded in argument by the learned counsel of the plaintiffs in error, that the county of Roanoke had no inherent right to borrow money and give its bonds for payment, and further, that if it had the power exercised through the agency of the county court in the present case, it was derived solely from the act of the legislature, passed October 31st, 1863. That act gives no such power in express terms.   This much is clear.   If, therefore, it was conferred at all, it is by implication merely.   While it is admitted that such a power may perhaps be thus conferred, yet, in view of its dangerous nature, its great liability to abuse, and the constant habit of the legislature to grant it in terms, when intended, the implication, to be justified, should be very clear indeed, if not irresistible.

There would seem to be no just ground for implication in the present case.   It was the duty of the county and corporation courts under the act to make an allowance in money or supplies to the soldiers and sailors and their families of such liberal amount and in such proportions as should be deemed just and sufficient for their maintenance; and it was declared that the allowance should be charged on the county, city, or town, and that "provision should be made for its payment in the manner prescribed by law for sums legally chargeable on counties, cities, and towns."

" The manner prescribed by law" for payment of the sums mentioned was by county levy. The law prescribed that mode and no other. Code of 1860, ch. 50, § 1; ch. 51, § 22; ch. 52, §§ 29, 31, 33, 42, 44; ch. 53, §§ 1, 2, 3, *et seq.*

The supplies were to be procured by purchase, and, if need be, by impressment, through agents appointed for the purpose, and the debts thus contracted were to be paid in the manner and by the means indicated. The express designation of a particular mode of raising the means excludes every other. The borrowing of money may be deemed by some a more appropriate mode than a levy in the ordinary way ; but the rule laid down by Judge Cooley is as applicable to statutes like the one under consideration as to constitutions—"that where the means for the exercise of a granted power are given, no other or different means can be implied, as being more effective or convenient." Cooley on Cons. Lim. 64 (marg.). And, as remarked by a distinguished author, who has given much thought and attention to the law relating to municipal corporations, " there is a great difference between contracting a debt in the prosecution of a legitimate corporate purpose and borrowing money for that purpose. In the one case, the application of the credit is secured to the advancement of the authorized object, while money borrowed is liable to be lost, or to be diverted to illegitimate purposes." 1 Dill. on Mun. Corp. (2d Ed.), § 82, note 1.

The statute, by its terms, was to continue in force " until six months after the ratification of a treaty of peace between the Confederate States and the United States," and the authorized allowance of "money," within the discretion of the courts, in lieu of "supplies," must be understood as limited to money on hand at the passage of the act and such as might be raised by subsequent levies.

The uniform legislation of the State from the earliest day, in relation to chartered municipal corporations and

*quasi* corporations, such as counties, shows that whenever the legislature intended that these corporations should be authorized to borrow money for any purpose, the power was expressly granted.

Conspicuous among special acts of this character were the acts of January 19th, 1861 (Acts of 1861, ch. 8, p. 35), and May 9th, 1862 (Acts of 1862, ch. 16, p. 16,)—the first authorizing the county courts to arm and equip the militia of their several counties, and the second to purchase and distribute salt among the people, and by both acts power was expressly given to negotiate loans to carry out the objects in view. And it is worthy of notice that in the last-named act two modes of raising money are provided, namely, "by county levies or by loans negotiated upon the bonds of [the] counties, to be redeemed by county levies or otherwise"—thus distinguishing between payment by means of county levies and payment by loans.

These acts were fresh in the mind of the legislature when the act of October 31st, 1863, was passed. Loans as a ready means of meeting demands under this last act could not have escaped attention, and must have been considered, and if approved doubtless would have been expressly authorized, as under the two previous acts. The exercise of so important a power as that of borrowing money would not, under the circumstances at least, have been left to doubtful implication. Such legislation, it is believed, would have been without precedent in the history of this State.

The omission of the provision for loans, in my opinion, was not unintentional. The counties, cities, and towns, had already incurred heavy obligations by loans under the previous acts. These obligations were generally outstanding and payment deferred. Confederate currency had become greatly depreciated, and was abundant. It was obvious that it would be better to purchase the supplies needed

for the soldiers and their families and pay for them by levies from year to year in the currency of the time, than to contract a heavy debt to be paid at a future day and, as they supposed, in a better currency. It was wise therefore not to augment the municipal debt of the State when there was no actual necessity for it, and hence the omission, intentional I believe, of any provision for loans under the act of October, 1863.

The authority for ratification given by the act of March 10, 1864 (Acts of 1863-4, ch. 47, p. 46), would seem to be equivalent to a legislative declaration, that loans under the act of October, 1863, were not authorized by that act.

I am of opinion that the county court of Roanoke had no power to borrow money of the plaintiffs in error and bind the county for its payment, and the bonds in suit are void, and hence, that the judgment of the circuit court on the plea of *non est factum* is right.

But it is conceded that the issue on that plea as framed was an immaterial issue—that is, not taken on a point proper to decide the action, and for this error the judgment should be reversed.

The plea avers, that the bonds are not the bonds of the county—" in this, that a majority of the acting justices of the said county were not present and had not been summoned to appear at said court when the county directed said bonds to be executed, and it was necessary that a majority of said justices should be present, and be summoned, to give legal authority for the execution of said bonds," &c.

The declaration alleges that a majority of the justices were present; but it is insisted that the allegation was not material, as the statute under which the bonds were issued did not require the presence of a majority of the justices, and thus by the issue joined the validity or invalidity of the bonds was made to depend on an immaterial fact.

Conceding for the purposes of this case, but not deciding, that the demurrer (for there was a demurrer) to the declaration was properly overruled, and further that the issue was, as alleged, immaterial, then, if the error is not cured by the statute of jeofails (Code of 1873, ch. 177, § 3), the usual course would be to award a repleader—that is, reverse the judgment, set aside the pleadings and remand the cause with directions that the parties plead *de novo*, for the purpose of obtaining a better issue. Stephen Plead. 98, 99 (marg. pp.); 4 Minor's Inst., part 1, 772 *et seq*, and cases there cited. But this is by no means the invariable course pursued.

It is said by Stephen to be laid down in *Goodburne* v. *Bowman*, 9 Bing. 532, "as a clear rule that the court will never grant a repleader, except when complete justice cannot be otherwise obtained." Stephen Plead. 100 (marg. p.). With this accords what is said in 7 Bacon's Abridg. (Bauria's Ed.) Title, Pleas and Pleadings, m. p. 657; 7 Comyn's Digest, Pleader, side p. 232. And it was held by this court at an early day, that although the issue may be immaterial, a repleader will not be awarded if it appear from the record that if the plea had been properly pleaded the decision of the issue must have been the same. *Henderson* v. *Foote*, 3 Call. 248.

Now, from the "facts agreed" on the record, it conclusively appears, in the view which has been taken, that the bonds sued are not the bonds of the county. If, then, a repleader be awarded, the further proceeding in the action upon a plea of *non est factum* properly pleaded must result ultimately and inevitably in the same judgment which this court has reversed. It would, therefore, appear little less than trifling with the administration of justice to award a repleader under such circumstances.

The conclusion reached makes it unnecessary to notice

the matters of defence presented by the other pleas; and, upon the whole case, I am of opinion to affirm the judgment of the circuit court.

CHRISTIAN, ANDERSON, and STAPLES, J's, concurred in the opinion of *Burks*, J.

JUDGMENT AFFIRMED.